**ELLOIE LAW**
Manu J. Elloie, Esq. (SBN 262645)
1185 Magnolia Ave Ste E #302
Corona, CA 92879
Telephone: (213) 213-4801
Email: manujelloie@gmail.com

Attorney for Plaintiff, CHRISTOPHER MEZA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER MEZA, an individual, <br><br> Plaintiff, <br><br> v. <br><br> DANIEL QUIDORT, in his individual and official capacity; TRENT TUNSTALL, in his individual and official capacity; TANYA KARAKESISOGLU, an individual; and DOES 1 through 100, Inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR:** <br><br> **(1) MALICIOUS PROSECUTION** <br> **(2) DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983—SUPPRESSION OF EXCULPATORY EVIDENCE** <br><br> **[UNLIMITED JURISDICTION]** <br><br> **[DEMAND FOR JURY TRIAL]** |

Plaintiff Christopher Meza (hereinafter "Plaintiff") hereby alleges as follows:

I.

## **INTRODUCTION**

1. This case is about a black man, Christopher Meza, who had a white girlfriend (Tanya Karakesisoglu). They had a son together, but the relationship soured and the two began a long-running and increasingly

COMPLAINT FOR DAMAGES- 1

bitter custody dispute. In the summer of 2016, while discussing the dispute, the girlfriend said to Meza, "You'd better agree to whatever I want (full custody) because I can ruin your life anytime I want. I can accuse you of rape and the police will always believe me." He didn't agree to her custody demands, and two weeks later she went to the police and accused him of rape. In her interview with detectives, she asked them whether this accusation would help her in getting sole custody."

2. The girlfriend asked Meza to meet her late at night at her office, on September 20, 2016, to give him a document she had agreed to sign consenting to a trip he was planning to take with their son. They had done this sort of meeting to exchange such documents before. Meza thought the late-night timing was odd, but she was a self-employed social-media influencer. When he got off the elevator, she pretended to be scared for the lobby video, then went with him to his house and had consensual sex.

3. Video from the parking garage, from approximately one minute after the lobby video, shows them walking calmly together, and shows her leaning in to kiss him. The sex video from the night shows unambiguously consensual sex. Furthermore, after the detectives discovered the video, she stated it was her idea to have sex. So there was undeniable evidence that there was no kidnapping and rape.

4. The following morning, Ms. Karakesisoglu got up and left early the next morning (she was at his house from approximately 3 a.m. to 5 a.m.), and proceeded to send Plaintiff a series of "I love you, we should get back together" texts. He told her he didn't think they should see each other

anymore. She responded by going to Huntington Beach Police Department and accusing him of kidnap and forcible rape.

5. The police arrested Meza, and imaged both their phones. Plaintiff told the detectives that this was a lie to get leverage in the custody dispute, and that all they had to do is look in her phone. The detectives asked the girlfriend if they could look at her phone, where she really didn't want them to, and it took a lot of persuading. She finally signed a consent, however, and one of the detectives opened it up and took a look. One of the first things he found was a record of her Googling "kidnap" the *day before* this incident, and texting a cop friend to ask, "What would happen to Chris if he were convicted of rape?

6. In lieu of carefully documenting the contents of the phone, preparing a report, and making sure the Deputy District Attorney saw the contents of her phone, as soon as the detectives saw that exculpatory material, the detectives immediately stopped looking at the phone, put it away, and never gave it to the Deputy District Attorney. The detectives stopped looking at the phone after seeing Ms. Karakesisoglu Google search, locked it in a safe, did not look again at the forensic image. The detectives only provided a limited report of Ms. karakesisoglu's phone to the Deputy District Attorney containing the googling of the word kidnap, a few very damaging texts, and the keyword search of the word rape.

7. Ms. Karakesisoglu initial accusation to the police was forcible rape; however, after seeing Mr. Meza's video proving that the sex was consensual, the detectives asked Ms. Karakesisoglu about her allegation and she admitted that in fact the sex was consensual and she had initiated it.

However, the detectives refused to drop the case and instead simply altered key elements to their stories as the complainant altered her story, all the while suppressing and withholding from the defense the complainant's phone.

8. The case stretched on for five years, before a new Deputy District Attorney was assigned, who made a no-custody misdemeanor offer. On August 24, 2021, the new DDA dismissed everything (and stated "insufficient evidence" on the record—not a generic § 1385.) Mr. Meza entered a *People v. West* plea to a single misdemeanor count of Penal Code §237, for pushing her into the elevator.

9. Between September 2016 and August 2021, Mr. Meza and his family spent hundreds of thousands of dollars on his defense, and he suffered significant reputational and emotional harms as well, not the least of which was that the complainant did exactly as she'd threatened to do, and leveraged the criminal complaint in family court to get sole custody of their child.

II.

**PARTIES**

10. Plaintiff CHRISTOPHER MEZA is over the age of 18 years old, and at all relevant times has been a resident of the County of Los Angeles, California, in the central district.

11. Defendant, TANYA KARAKESISOGLU at all relevant times mentioned in this complaint, is an individual, and a resident of the County of Orange, California. On information and belief, she is now a resident of the State of Florida.

12. On information and belief, Defendant, DANIEL QUIDORT is now, and at all relevant times mentioned in this complaint an individual, and a resident of the County of Riverside, California. DANIEL QUIDORT was, at all relevant times, an officer with the Huntington Beach Police Department. He committed the acts at issue herein during the course and scope of his employment with the Pasadena Police Department, within the Central District of California. He is sued in his individual and official capacities.

13. On information and belief, Defendant, TRENT TUNSTALL is now, and at all relevant times mentioned in this complaint an individual, and a resident of the County of Riverside, TRENT TUNSTALL was, at all relevant times, an officer with the Huntington Beach Police Department. He committed the acts at issue herein during the course and scope of his employment with the Pasadena Police Department, within the Central District of California. He is sued in his individual and official capacities

14. Plaintiff is unaware of the true names and capacities of Defendants sued herein as Does 1-100, inclusive ("Doe Defendants" or "Does"), and therefore sues these Doe Defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of said Doe Defendants when ascertained. Plaintiff is informed and believes, and thereon alleges, that at all relevant times mentioned herein, each of the fictitiously- named Doe Defendants conducted business in Riverside County, Los Angles, and Orange County, California, and are culpable or responsible in some manner and or conspired with one or more of the other Defendants for the conduct, acts omissions, occurrences,

injuries, and damages herein alleged, and that the Plaintiff's injuries and damages were directly and proximately caused thereby TANYA KARAKESISOGLU, DANIEL QUIDORT, TRENT TUNSTALL and Doe Defendants are hereinafter referred to collectively as "Defendants"

15. Plaintiff is informed and believes and thereon alleges that each of the named and defendants identified in this Complaint was the agent, partner, co-joint venturer, associate and or/ employee of one or more of the other defendants and was acting in the course and scope of such agency, partnership, joint venture, association and/ or employment when the acts giving rise to the causes of action occurred. Plaintiff further alleges that each defendant is liable under the alter ego theory of liability.

### III.
### JURISDICTION AND VENUE

16. Pursuant to 28 USC 1331, this Court has subject-matter jurisdiction over this action because the case arises under the Fourth and Fourteenth Amendments to the United States Constitution, and under Title 42, section 1983 of the Unites States Code. Any additional claims arising from the acts and omissions herein alleged are supplemental in nature as that term is interpreted for the purposes of 28 USC §1367.

17. Venue is proper in this Court because all or a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

### IV.
### GENERAL ALLEGATIONS

18. Plaintiff and Defendant Karakesisoglu were at one time romantically involved, where they have a son together. Ms. Karakesisoglu had threatened Plaintiff on more than one occasion, that she could get ruin his life by accusing him of rape if he didn't agree to her custody demands. This is exactly what Ms. Karakesisoglu did when she falsely accused Plaintiff of rape, kidnaping by force, forcible oral copulation, criminal threats and kidnapping. On the basis of Karakesisoglu's false representation to the Huntington Police Department, on or about September 21, 2016, Plaintiff was arrested and charged with kidnapping to commit rape, robbery, oral copulation, sodomy, forcible oral copulation, criminal threats, and attempted kidnapping, inter alia. All of the above charges were dismissed on August 24, 2021.

19. From the time in which Plaintiff was arrested, he informed the detectives who were charged with working his case, that he was innocent of the above mentioned charges, where he also informed them that he had evidence that would prove his innocence. Despite detective Quidort and Tunstall reviewing the video of the consensual sex between Plaintiff and Karakesisoglu on the night of the alleged incident, they refused to recommend that the allegations pertaining to sexual charges not be pursued. Rather, they aided Karakesisoglu in changing her narrative to fit the facts so as to help her case against Plaintiff.

20. Detective Quidort provided a probable cause affidavit to the Court that resulted in the issuance of a search warrant for Plaintiff's property. Among the items that were turned over during that search, was Plaintiff's phones. During an interview with Defendant Karakesisoglu, detective

Quidort and detective Tunstall were able to image her phone as well despite her protestation. When performing a search through the phone of Karakesisoglu, it was found out that a day before she made her false police report about Plaintiff, she had googled the word "kidnap", and had also texted someone, "What would happen to Chris if he were convicted of rape?" After reviewing the contents of Ms. Karakesisoglu's phone, the detectives knew that the information contained therein was exculpatory evidence that must be turned over to the Deputy District Attorney, as well as the Plaintiff. They also knew or should have know that after going through Ms. Karakesisoglu's phone, there was likely additional exculpatory evidence contained therein. However, they did not turn over the phone and the DDA at that time took a see-no-evil hear-no-evil posture and purposely did not request an image of the phone, thereby providing a reason as to why the defense doesn't get a copy.

21. During Ms. Karakesisoglu's interview with the detectives, she also discussed the ongoing custody dispute between Plaintiff and her, where she asked them what effect a criminal case against Plaintiff would have on her family law case. Again, the detectives knew that Ms. Karakesisoglu's statements regarding the custody dispute in relation to the criminal case against Plaintiff, along with the contents of her phone, represented a problem for Ms. Karakesisoglu credibility, where there was a probability that she was misusing the criminal justice system to gain an advantage in a child custody dispute with Plaintiff. At a minimum, the aforementioned information should have been provided to the Deputy District Attorney for consideration. By not providing the information to the Deputy District

Attorney, and willfully ignoring the additional exculpatory evidence that was on Ms. Karakesisoglu's phone, Detectives Quidort and Tunstall prevented Plaintiff from getting a copy of Ms. Karakesisoglu phone during the discovery phase of his criminal case.

22. It is manifest that the information that Quidort and Tunstall obtained by way of their interview with Ms. Karakesisoglu, as well as reviewing her phone, was exculpatory in nature, where said information would have been favorable to Plaintiff's defense in his then criminal case. Both Quidort and Tunstall had an obligation to further inquire into the phone of Ms. Karakesisoglu based on their initial discoveries therein. As state actors, both Tunstall and Quidort as officers for the Huntington Beach Police Department are liable to Plaintiff under 42 USC 1983 for their reckless indifference, and disregard for Plaintiff's rights when they made the decision not to turn over the clearly exculpatory evidence to the Deputy District Attorney.

23. To exacerbate matters, during Plaintiff's criminal case, the detectives maintained that there was not any exculpatory evidence on the phone of Ms. Karakesisoglu, despite immediately knowing that was not the truth. In fact, there was texts from Ms. Karakesisoglu saying "I love you" to Plaintiff the day after the alleged crimes took place. Plaintiff was denied the benefit of additional exculpatory evidence that was present on the phone of Ms. Karakesisoglu as a result of the actions of the detectives.

24. As a result of Defendants' failure to act in accordance with the terms of the law, Plaintiff has sustained significant damages.

III.

# FIRST CAUSE OF ACTION

## MALICIOUS PROSECUTION

### (AGAINST TANYA KARAKESISOGLU AND DOES 1 THROUGH 100)

25. Plaintiff re-alleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

26. Defendant Tanya Karakesisoglu intended to and did cause, and was actively involved in causing, Mr. Meza to be arrested on suspicion of forceable rape, kidnapping to commit forcible rape, forcible oral copulation, criminal threats and kidnapping. Ms. Karakesisoglu intended and attempted to cause Mr. Meza to be prosecuted for forceable rape, forcible oral copulation, kidnapping to commit forcible rape, criminal threats and kidnapping. Ms. Karakesisoglu acted maliciously and in bad faith, in order to retaliate against Mr. Meza for ending his relationship with her, as well as to gain an upper-hand in their ongoing custody dispute over their son. Ms. Karakesisoglu, knew full well that Mr. Meza had not forcible raped her, kidnapped her, made criminal threats to her, kidnapped her to commit rape, or engaged in forcible copulation with her, and that there was no probable cause that Mr. Meza committed the alleged crimes that were eventually dismissed in the criminal action. Nothing in this cause of action is intended to address Mr. Meza's misdemeanor plea under Penal Code §237.

27. The criminal proceeding ended in Mr. Meza's' favor on August 24, 2021, when his charges of forceable rape, forcible oral copulation, kidnapping to commit forcible rape, criminal threats ,and kidnapping, were dismissed by the Orange County Superior Court.

28. No reasonable person in Defendant's circumstances would have believed that there were grounds for Mr. Meza to be arrested on charges for forceable rape, forcible oral copulation, kidnapping to commit forcible rape, criminal threats and kidnapping. The video recording of the events evidences that Mr. Meza and Ms. Karakesisoglu had consensual sex on the night from which the false allegations stemmed. There was also clear evidence on Ms. Karakesisoglu phone in the form of text messages, where she texted Mr. Meza just hours after the alleged events that she loved him and wanted to get back together.

29. Ms. Karakesisoglu did not accuse Mr. Meza for the purpose of bringing Mr. Meza. to justice for committing a crime; rather, Ms. Karakesisoglu accused Mr. Meza for the purpose of retaliating against him for not rekindling their relationship as well as in an attempt to gain an upper-hand in their ongoing child custody dispute.

30. Mr. Meza was harmed by Defendants' wrongful conduct, and Ms. Karakesisoglu's conduct was a substantial factor in causing him harm. Mr. Meza was forced to expend thousands of dollars to make bail after his wrongful arrest, and hundreds of thousands of dollars in legal fees to obtain a dismissal related to the events. Records of the arrest persist in multiple databases and records, and will persist for years to come, causing Mr. Meza reputational harm and financial harm in the form of likely lost employment opportunities when potential employers view the arrest records.

31. The detectives stripped searched Mr Meza, in which they threatened "make it abundantly clear that you do not want to speak to an attorney or this is going to happen.' The nature of a strip search is usually consistent

when a victim who is not familiar with the attacker and sexual body parts may need to be identified. This did not fit the situation at hand and Mr. Meza's privates were recorded and imaged as a way to threaten, harass, embarrass, and dehumanize him.

32. Mr. Meza suffered significant financial harm by nature of the false charges leveled against him. Mr. Meza continues to suffer emotional and psychological harm in the form of constant fear of further retaliatory acts by Ms. Karakesisoglu, that have in part already materialized in the ongoing family law matter. Mr. Meza will suffer economic and emotional harm by as a result of the nature of the charges, loss of time spent with his son, and psychological harms. Mr. Meza has also suffered and continues to suffer severe emotional and psychological distress arising from the false and wrongful arrest.

33. Defendant acted for the purpose of causing Plaintiff to suffer financial loss and severe emotional distress and physical distress and are guilty of oppression and malice, justifying an award of exemplary and punitive damages.

## IV.

## **SECOND CAUSE OF ACTION**

**Deliberate or Reckless Suppression of Evidence in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983**

**(AGAINST DANIEL QUIDORT, TRENT TUNSTALL AND DOES 1 THROUGH 100)**

34. Plaintiff re-alleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

35. Defendants Tunstall and Quidort deprived Mr. Meza of his constitutional rights by deliberately and recklessly suppressing exculpatory evidence. Defendants acted deliberately to intervene in the criminal discovery process in an attempt to prevent the District Attorney's Office from discovering material favorable to Mr. Meza, so that evidence would never see the light of day, would be suppressed from and unknown to the prosecutor, the defense, and the court in Mr. Meza's criminal case .

36. Defendants did so with the deliberate and express intention of impairing and undermining Mr. Meza's right and ability actively defend himself in his criminal case, to aid the prosecutor in attaining a conviction against Mr. Meza, and to prevent the exculpatory evidence of being turned over in the discovery phase of the litigation.

37. Defendants deliberately and recklessly suppressed from both the prosecution defense, and the Court, the evidence exculpatory evidence that was present on Ms. Karakesisoglu phone. In imaging her phone, they knew that she had texted Mr. Meza "I love you" hours after the alleged rape.They also were aware that Ms. Karakesisoglu had googled the word "kidnap", and had also texted someone, "What would happen to Chris if he were convicted of rape? , the day prior to her making her false police report regarding Plaintiff kidnapping her and forcibly raping her, where after having such knowledge, they refused to look further into Ms. Karakesisoglu's phone.

38. Defendants were deliberately indifferent to Mr. Meza's constitutional rights to due process and a fair trial. Defendants did not care if Mr. Meza was wrongfully convicted, where they acted with the purpose of aiding Ms

Karakesisoglu in the criminal case against Mr. Meza, and as a byproduct, helped her family law case against him as well.

39. Defendants actively hoped and intended that Mr. Meza would be convicted while never knowing about the suppressed impeachment materials.

40. It is a clearly established constitutional rule that government officials, may not suppress exculpatory evidence. That constitutional rule has been clearly established for more than forty years. Defendants Tunstall and Quidort were on actual and constructive notice of it, and deliberately violated it, with the specific intent to harm Mr. Meza, viz., to procure his prosecution and conviction for "kidnapping to commit rape", by preventing him from obtaining evidence that could have resulted in the charges being dismissed.

41. Defendants' deliberate decision to attempt to procure Mr. Meza's conviction by burying exculpatory evidence and preventing the defense, the prosecution, or the Court from seeing it is reprehensible, malicious, outrageous, and warrants imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as to all causes of action as follows:

1. For compensatory and general damages according to proof at trial, including prejudgment interest thereon;
2. For special damages according to proof at trial, including prejudgment interest thereon;

3. For costs, expenses and attorneys' fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by law;

4. For an award of punitive/exemplary damages according to proof at trial, including prejudgment interest therein;

5. For emotional distress and mental anguish damages according to proof at trial;

6. For pre judgment and post judgment interest;

7. For such other and further relief as the Court may deem necessary, just or proper;

Respectfully Submitted,

DATED: June 6, 2023

By _____
MANU J. ELLOIE
Attorney for Plaintiff
Christopher Meza

## **DEMAND FOR JURY TRIAL**

Mr. Meza demands a jury trial.

Respectfully submitted,

DATED: June 6, 2023

By _____
MANU J. ELLOIE
Attorney for Plaintiff
Christopher Meza